# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

MARTIN CAMPBELL,

               Plaintiff,

    v.

MICHAEL ASTRUE,
Commissioner of Social Security,

               Defendant.

_____/

CASE NO. 1:09-cv-00719-SMS

ORDER REVERSING THE SOCIAL SECURITY AGENCY'S DETERMINATION AND REMANDING FOR PAYMENT OF DISABILITY BENEFITS

Plaintiff Martin Campbell, proceeding *in forma pauperis*, by his attorney, Law Office of Henry Reynolds, seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying in part and approving in part his application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act") and supplemental security income ("SSI"), pursuant to Title XVI of the Act. The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate Judge.[1] Following a review of the complete record, this Court concludes that the ALJ erred in rejecting Plaintiff's testimony regarding the degree of pain that he experienced, in focusing primarily on the final report of the surgeon who performed Plaintiff's 2006 cervical fusion, and in rejecting the reports of treating and examining physicians in favor of the opinions of the agency's reviewing physicians, who

---

[1] Both parties consented to the jurisdiction of a United States Magistrate Judge (Docs. 6 & 8).

1

neither treated nor examined Plaintiff.  Accordingly, the Court reverses and remands for payment of benefits.

## I.   Administrative Record

### A.   Procedural History

On December 1, 2005, Plaintiff filed protectively for disability insurance benefits and for SSI benefits, alleging disability beginning May 24, 2005.  AR 22.  His claims were initially denied on December 22, 2005, and upon reconsideration, on April 4, 2007.  AR 22.  On April 30, 2007, Plaintiff filed a timely request for a hearing.  AR 22.   Plaintiff appeared and testified at the hearing on March 12, 2008.  AR 40-77.  On July 22, 2008, Administrative Law Judge James N. Mitchell, Jr., ("ALJ") determined that Plaintiff was disabled from May 24, 2005 through January 13, 2007, but was able to work thereafter.  AR 22-35.  The Appeals Council denied review on March 23, 2009.  AR 1-4.   On April 21, 2009, Plaintiff filed a complaint seeking this Court's review (Doc. 1).

### B.   Agency Record

**Plaintiff's testimony.**  Plaintiff (born April 28, 1973) dropped out of high school in eleventh grade.  AR 43.   From 1995 to 2004, his work included driving an 18-wheel truck that carried hay, and loading and unloading it, sometimes with a forklift.  AR 44-45.  He maintained a federal log book.  AR 45.  Plaintiff was responsible for cleaning his truck and maintaining grease fittings, but did no other truck maintenance.  AR 45.  Before 1995, he trained racehorses for his father but was not paid for that work.  AR 46.  He also worked briefly as a cleaner in a slaughterhouse.  AR 47.

Plaintiff's disability began on May 24, 2005, when he was taken to the hospital.  AR 49. At the time of the hearing, he experienced pain in his lower back, in between his shoulders, and at the base of his neck.  AR 58.  Plaintiff had pain in his right arm, and pain and numbness in both legs and feet.  AR 61.  Using his right hand was difficult since it was numb and prone to cramping.  AR 64.  (Plaintiff is left-handed.  AR 63.)  The pain was moderate to severe, sharp and tingling, and numb.  AR 61.  Plaintiff experienced severe pain (8 or 9 on a ten-point scale) about four times a week.  AR 65.  At those times, he laid down on the floor to get relief.  AR 66.

Nearly every body position, sitting, standing, or lying down, hurt.  AR 62.  Lying flat on the floor gave Plaintiff some relief.  AR 62.  At the time of the hearing, his doctors had directed that he not push, pull, lift anything over five pounds, squat, bend over, walk, or climb ladders. AR 56.  He testified to difficulty reaching up but not to the front or sides.  AR 58-59.  Plaintiff had no difficulty picking up or holding onto small objects.  AR 59.   Because his hands were insensitive to hot and cold, he frequently burned himself.  AR 59.  Pain and stiffness in his neck limited his ability to turn his head left or right.  AR 60.  He had difficulty looking down without pain.  AR 69.  Plaintiff rested for an hour once or twice daily.  AR 66.

Plaintiff was unable to put on his own socks and shoes, finding it too difficult to bend down and get back up without help.  AR 58.  His wife also helped him dress and bathe.  AR 63. Although he sometimes accompanied his wife on short shopping trips (as to pick up milk), he had difficulty getting into and out of the car, and could not sit in the car long.  AR 66.  On the 35- to 40-minute drive to the hearing, Plaintiff's wife had to stop the car once to allow him to get out and stand for ten or fifteen minutes.  AR 67.

At the time of the hearing, Plaintiff lived with his father-in-law and, along with his wife and two children, lived on public assistance.  AR 48.  Because activity increased his pain, he did not cook or do any housework.  AR 51, 65.  He spent his time sitting and standing, talking with family members.  AR 53.  He did not drive because turning and looking was difficult.  AR 54.

In the course of the hearing, the ALJ admonished Plaintiff for standing up without asking permission.  AR 49.  Plaintiff apologized and explained that he was uncomfortable.  AR 49. Later, Plaintiff's attorney stated that some medical records had not yet been submitted, but that Plaintiff was again being considered for surgery.  AR 57.  The ALJ granted twenty days to produce additional records.  AR 76.

**Plaintiff's Disability Report.**[2]  Plaintiff was laid off from work on November 1, 2004. AR 137.  He became unable to work on May 24, 2005, when compressed nerves in his neck and

---

[2]  Because Plaintiff's disability reports are not dated, the Court has used incidents reported in each to approximate the order in which the reports were prepared.  The agency record includes no third-party disability reports prepared by a friend or family member.

spine led to numbness in his arms.  AR 137.  Plaintiff could not grab anything, and his fingers had curled into a fist.  AR 137.  His medications included Lotrel,[3] carisprodol,[4] and Vicodin.[5]  AR 142.

Plaintiff's prior jobs included kill floor worker at a slaughter house, laborer for a moving company, horse trainer, truck driver, and welder.  AR 138. Although he left high school after completing the tenth grade, he completed a diesel mechanic training program in 1995.  AR 143.

**Plaintiff's Second Disability Report.**  Plaintiff reported having had surgery.  AR 180. Beginning about March 25, 2006, Plaintiff noted a loss of movement and inability to turn his head.  AR 174.  By March 30, 2006, he noticed numbness in both arms and hands, and pain in his left shoulder and arm and in the middle of his back.  AR 174.

**Plaintiff's Third Disability Report.**  Beginning on April 9, 2006, Plaintiff's left arm became numb, and he sometimes could not feel his fingers.  AR 161.  He experienced severe pain when he coughed, sneezed, or picked up things weighing more than ten pounds.  AR 164. Bending over, sitting down, showering, and moving his head also presented problems.  AR 164. His medications included diazepam,[6] hydrochlorothiazide,[7] Lortab,[8] Lotrel, and Temazepam.[9]  AR 163.

---

[3]  Lotrel (amlodipine and benazepril) is a calcium channel blocker prescribed to treat high blood pressure. www.drugs.com/lotrel.html (December 14, 2010).

[4]  "Carisprodol, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by sprains, strains, and other muscle injuries." www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000717 (December 14, 2010).

[5]  Vicodin (acetaminophen and hydrocodone) is a narcotic pain reliever used to relieve moderate to severe pain.  www.drugs.com/vicodin.html (December 14, 2010).

[6]  Diazepam is prescribed to relieve anxiety, muscle spasms, and seizures, and to control agitation caused by alcohol withdrawal.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000556 (December 14, 2010).

[7]  Hydrochlorothiazide, a "water pill," is used to treat high blood pressure and fluid retention caused by various conditions such as heart disease.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000714 (December 14, 2010).

[8]  Lortab  (acetaminophen and hydrocodone) is a narcotic pain reliever used to relieve moderate to severe pain.  www.drugs.com/lortab.html (December 14, 2010).

[9]  Temazepam is a benzodiazepine used on a short-term basis to treat insomnia. www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000808 (December 14, 2010).

**Medical records.**  Plaintiff was seen in the Memorial Medical Center emergency room on April 13, 2005.  AR 116.  The report noted that Plaintiff went to bed and awoke with a stiff neck and numbness in his right arm.  AR 116.  Upon admission, Plaintiff could not move his head.  AR 124.  His pain was sharp and severe.  AR 116.  X-rays of Plaintiff's cervical spine revealed no fracture or misalignment, but mild degenerative changes, including loss of joint space and formation of small osteophytes.  AR 125.  The doctor treated him with medication.  AR118, 122.

Magnetic resonance imaging on April 20, 2005, revealed calcification of Plaintiff's posterior longitudinal ligament, raising the possibility of ankylosing spondylitis,[10] and multilevel degenerative changes from C3-4 to C6-7.  AR 193-194.

Plaintiff returned to Memorial Medical Center on May 18, 2005, after his car was "t-boned" in an accident.  AR 127.  Plaintiff reported moderate pain in his neck, between his shoulders and in his lower back, and numbness in both arms.  AR 127, 132.  On examination, his neck and back were tender.  AR 128.  X-rays indicated no acute abnormalities and no prevertebral soft tissue swelling, but revealed moderate degenerative changes at C4-5.  AR 135.

On May 31, 2005, Dikram Bairaimian, M.D., examined Plaintiff at the neurosurgical clinic of Stanislaus County Health Services Agency.  AR 205-206.  Bairaimian reported that Plaintiff's neck pain had progressed since it started two months before.  AR 205.  Plaintiff also complained of paresthesia in his right upper extremity to the dorsum of his hand and the middle three fingers.  AR 205.  He had no radicular pain.  AR 205.  Neck movement was limited and painful.  AR 205.  The back of Plaintiff's neck was tender.  AR 205.  Light touch and pinprick indicated reduced sensation.  AR 206.  Bairaimian elected to treat Plaintiff conservatively with analgesics, rest, and physical therapy.  AR 206.  He noted that if Plaintiff's symptoms worsened and he could not live with them, further evaluation could be performed with a cervical myelogram and a post-myelographic CT scan.  AR 206.

///

---

[10]  "Ankylosing spondylitis is a long-term disease that causes inflammation of the joints between the spinal bones, and the joints between the spine and pelvis.  It eventually causes the affected spinal bones to join together." health.google.com/health/ref/Ankylosing+spondylitis (December 28, 2010).

1   On June 28, 2005, Plaintiff returned to Bairamian's office and requested further testing.

2   AR 204.  His pain and parathesia continued.  AR 204.  Bairamian advised Plaintiff that if he had

3   nerve root compression, surgery could relieve the paresthesia but not the pain.  AR 204.

4   Dennis Boyce, M.D., reported findings of a cervical myelogram performed on July 5,

5   2005.  AR 250-251.  He noted:

6   Amputated nerve root sheaths on the right at C4-5 and C5-6.  CT will follow to
    determine the cause of the nerve root sheath amputation.  Degenerative spondylotic
7   change of the cervical spine is noted included [*sic*] a triangular bony density in the
    soft tissue anterior to C4 and C5 which does not have the appearance of a recent
8   fracture, but probably dystrophic anterior spinal ligamentous calcification.

9   AR 250-251.

10  Boyce also prepared a report of a computed tomography cervical spine (post myelogram)

11  plus 2-D sagittal and coronal reformatted images performed on July 5, 2005.  AR 248-249.  He

12  reported his impression:

13  There is a significant compromise of the right neural foramen and right lateral
    recess at C4-5 due to an uncovertebral joint osteophyte in combination with a
14  broad-based disc protrusion.

15  At C5-6, there is an amputation of the right C5-6 nerve root sheath, compromise of
    the right lateral recess and slight impression upon the cervical spinal cord due to
16  broad-based disc protrusion in association with an uncovertebral joint osteophyte.

17  Very small posterolateral protrusion at C6-7.

18  No abnormalities noted at C7-T1.

19  AR 248-249.

20  On July 26, 2005, Bairamian saw Plaintiff after his cervical myelogram and post

21  myelographic CT scan.  AR 202-203.  Plaintiff's pain and parathesia continued.  AR 202.  The

22  cervical myelogram showed decreased filling of the right C6 nerve root.  AR 202.  The post

23  myelographic CT showed narrowing of the right C5-6 foramen.  AR 202.  Bairamian repeated his

24  counsel that surgery would relieve the paresthesia but not the pain.  AR 202.

25  On September 20, 2005, Bairamian again saw Plaintiff for a follow-up examination.  AR

26  200-201.  Plaintiff's right-side paresthesia had worsened, and he was experiencing left-side

27  paresthesia to a lesser degree.  AR 200.  Bairamian commented:

28  ///

I told the patient that the findings in the imaging studies are rather subtle.  They did show decreased filling of the right C6 nerve root at the right C5-6 foramen.  I told him that I do not have any explanations for the left sided symptoms.  I told him that if he decides to undergo surgery, I am unable to give him any numbers regarding the odds of success, however, I told him that surgery will not help the neck pain at all.  I told the patient and his wife that if they want to have a second opinion, I will refer them to San Francisco.  I will extend his work release by another month.

AR 200-201.

At the follow-up appointment on October 25, 2005, Plaintiff told Bairamian that his neck pain was his main problem.  AR 198.  Bairamian reminded Plaintiff that surgery would not help the neck pain at all and that seeing a pain management specialist might be a better option.  AR 198-199.  The clinic record noted that EMG and nerve conduction studies were within normal limits.  AR 198.

On December 9, 2005, Matthew Lynn, M.D., reported on Plaintiff's magnetic resonance imaging:

1.  There is multilevel degenerative disk disease with multiple anterior extradural defects present as described above.  The only anterior extradural defect which is felt to be clinically significant at this point is on the C5-6 level.  This is eccentric to the right.  This causes anterior effacement of the thecal sac and may be causing some mild impingement of the cord.  On this study, it appears to be due to posterior spurring.  On the prior CT myelogram of 07/05/2005, it was felt to be due [to] posterior spur with associated broad-base disk protrusion.  This lesion causes no definite cord compression or cord edema.

2.  There is question of bilateral neural foraminal stenosis as described above.  Whether the narrowing of the neural foramina is due to osteophytic impingement is clinically significant or not is uncertain.

AR 254-255.

In a report dated December 13, 2005, David S. Kerwin, M.D., of the University of California at San Francisco medical center ("UCSF") diagnosed lower back pain, neck pain from two compressed nerves in spine, and high blood pressure.  AR 188.  The doctor observed radiculopathy, paresthesia in both arms, and tenderness of the neck and back.  AR 188.  A pelvic x-ray revealed nothing remarkable.  AR 337.

Plaintiff's condition remained substantially the same at his December 27, 2005, follow-up appointment with Bairamian.  AR 196.  Plaintiff had recently had magnetic resonance of his cervical spine since that was required before his consultation with the UCSF.  AR 196.  Magnetic

resonance revealed mild central stenosis and right C3-4, C4-5, and C5-6 foraminal stenosis.  AR 196.

After summarizing Plaintiff's condition and medical history in a report to Bairamian dated February 7, 2006, Kerwin opined:

> He has failed to improve over these 10 months with conservative management, and he has a clear cut structural abnormality that I think largely is related to his symptoms, particularly the numbness in his right thumb and index finger.  I think an anterior cervical discectomy and fusion with or without plating as needed is the most appropriate treatment.

AR 215-216.

On March 24, 2006, surgeon Lawrence Pitts, M.D., performed a C5-6 anterior cervical discectomy and fusion with cadaveric bone.  AR 213-214.

On March 25, 2006, Plaintiff went to the emergency room of Doctors Medical Center, complaining of pain.  AR 272-278.  He informed emergency room personnel that he had surgery and had been discharged from UCSF earlier that day with Norco for pain.[11]  AR 272.  He explained that he had high tolerance to pain relievers after a long period of chronic pain and requested a narcotic injection.  AR 272.  Christine Cavanaugh, N.P., wrote:

> The patient was given 15 mg. of morphine intramuscularly and 25 mg of Phenergan.  This reduced his pain to 4/10.  However, the patient continued to complain of stiffness in the paraspinous regions bilaterally.  Additionally he was give 10 mg of Valium p.o. before discharge.  He was completely comfortable.  I did speak with his surgeon over at UCSF and requested direction in pain control.  The neurosurgeon was quite surprised that the patient required such a high dose of morphine for pain control and advised me not to give him any additional prescriptions for home.  However, I did speak to my supervising physician, Dr. Benign Schifrin in regard to this patient's pain as I believe it was real and his Norco prescription is not going to cover his discomfort in the next several days when he is unable to see his neurosurgeon as the patient had an extremely high tolerance to Norco from previous chronic pain.  Therefore, Dr. Schifrin advised me to start the patient on a fentynyl patch, which he can begin tomorrow and change it every three days.

AR 273.

Carl Claybaugh, M.D., evaluated five cervical spine x-rays taken April 14, 2006, and diagnosed anterior fusion at C5-6 with a bone plug; osteoarthritis, and spasm.  AR 270.

---

[11]  Norco (acetaminophen and hydrocodone) is a narcotic pain reliever used to relieve moderate to severe pain.  www.drugs.com/norco.html (December 15, 2010).

8

A post-operative x-ray report, dated May 2, 2006, reported:

1.  Lateral and frontal views of the cervical spine demonstrate C5-6 intervertebral body bone graft.

2.  Straightening of the cervical spine.

3.  Ossification anterior to C4-5 which may represent a bone fragment versus osteophyte with no clear donor site identified.

4.  Degenerative changes throughout the cervical spine with disc space narrowing and osteophyte formation, moderate.

AR 212.

At his examination, Plaintiff reported that the tingling in his arm had improved but he still had "a lot of pain in the back of his neck."  AR 221.  Pitts reported to Bairamian:

> The numbness and tingling in his arm is substantially better, although he still has occasionally some tingling in his thumb and index finger that is diminishing with time.  His arm pain is largely resolved.  He still has aching in his neck.  Unfortunately, he has adopted an extremely rigid posture, holding his head thrust forward and with very little range of motion at all.  This has actually caused him to have some low back pain as well.

> Plain x-rays show the graft to be in excellent position.

> I recommend strongly that he begin gently increasing his range of motion back to a full range of motion.  I have asked him to continue wearing his Philadelphia collar for three more weeks while in the car, but he can be out of it at home.  I have said that he can resume driving a truck in three weeks' time and lifting hay in two weeks' time.  I think he is doing generally well, but needs clearly to improve his posture to a more erect posture and improve his range of motion.

AR 211.

Plaintiff received a physical therapy evaluation on May 26, 2006.  AR 287.  Short-term goals were to increase strength and mobility; long-term goals included restoration of full function and minimal pain without medication.  AR 287.  After attending his first two therapy sessions, Plaintiff cancelled the next session and suspended contact with the physical therapists.  AR 288.[12]

On September 14, 2006, Alan Schaffert, M.D., conducted an electromyography evaluation to determine the cause of the increased numbing of Plaintiff's right center, ring, and little fingers following his surgery.  AR 268.  Nerve conduction in Plaintiff's right arm was normal.  AR 268.

---

[12]  Nothing in the record explains why Plaintiff discontinued physical therapy.  At the hearing, no one requested a reason for Plaintiff's discontinuing physical therapy.

This meant that the numbness was not attributable to either right ulnar neuropathy at the elbow or to a right lower cervical radiculopathy.  AR 268.  *See also* AR 359-360.

Matthew Iwamoto, M.D., reviewed five cervical spine x-rays taken January 12, 2007.  AR 267.  He reported a "near complete bony fusion of the bone plug at the C5-6 level" and a spine than that appeared more stable than was revealed by Plaintiff's earlier x-rays.  AR 267.  Iwamoto noted "some mild encroachment of the intervertebral foramina on the right at the C3-4 level."  AR 267.

On July 16, 2007, Boyce prepared a "Final Report–MR MRI Cervical w/wo Contrast," in which he compared current magnetic resonance images of Plaintiff's cervical spine with prior images.  AR 305-306.  He opined that the C5-6 fusion resolved the anterior impingement upon the thecal sac and mild impingement on the spinal cord.  AR 306.  Nonetheless, he noted a moderate compromise of the right C3-4 neural foramen due to a large uncovertebral joint osteophyte and a marked compromise of the right C4-5 neural foramen due to a prominent uncovertebral joint osteophyte.  AR 306.  He found no evidence of disc herniation or cord compression.  AR 306.  *See also* 338-339.

Boyce also reported on a lumbar MRI, noting:

Moderate degenerative disc disease at L3-4 associated with mild generalized bulging of the annulus fibrosis.

Mild degenerative disc disease at L5-D1 with a small midline disc protrusion effacing epidural fat, but not causing compression of the thecal sac nor displacement of nerve roots.

There is no evidence of disc herniation or bony spinal canal stenosis.

AR 340-341.

On June 26, 2007, following Dr. Kerwin's referral, anesthesiologist Athanasios S. Magimbi, M.D., of the Sutter Tracy Community Hospital pain clinic examined Plaintiff following Plaintiff's complaints of continued chronic pain following his surgery and low back pain radiating

///
///
///

to his leg.  AR 310-311, 329.  Magimbi diagnosed probable degenerative spondylosis[13] of the lower back and ordered an MRI.  AR 311, 312.

On July 26, 2007, Magimbi treated Plaintiff with a cervical epidural steroid injection.  AR 309.  Magimbi noted that he gave Plaintiff the injection to relieve cervicalgia, degenerative disk disease of the cervical spine, cervical radiculopathy, and failed cervical surgery syndrome.  AR 309.

On October 4, 2007, Plaintiff was examined by Adrian Ramos, M.D., at Del Puerto Medical Center for his neck and back pain.[14]  AR 342-344.  The examination was normal, but Ramos noted tenderness in the area of the third, fourth, and fifth lumbar vertebrae.  AR 343.  Plaintiff's range of movement was limited in right and left flexion, and anterior and posteriior flexion.  AR 343.  Straight leg raising exercises elicited pain.[15]  AR 343.  Ramos diagnosed worsening intervertebral disc disorder with myelopathy, cervical region, and intervertebral disc disorder with myelopathy, lumbar region.  AR 343.  October 4, 2007 x-rays of Plaintiff's pelvis revealed mild sacroiliac joint arthropathy bilaterally.  AR 336.

On October 24, 2007, Ramos saw Plaintiff for continued back and neck pain.  AR 332-335.  Ramos diagnosed intervertebral disc disorder with myelopathy in both the cervical and lumbar regions, and mild bilateral sacroiliac arthropathy.  AR 333.[16]

///

---

[13] " Spondylosis is a term referring to degenerative osteoarthritis of the joints between the centra of the spinal vertebrae and/or neural foraminae.  In this condition the interfacetal joints are not involved.  If severe, it may cause pressure on the nerve roots with subsequent sensory and/or motor disturbances, such as pain, paresthesis, or muscle weakness in the limbs."  en.wikipedia.org/wiki/Spondylosis (December 28, 2010).

[14] Dr. Ramos had been Plaintiff's family doctor for many years.  AR 55.  Plaintiff returned to Dr. Ramos for care after Dr. Kerwin stopped accepting Plaintiff's insurance.  AR 55.

[15] The straight leg raising test is administered during a physical examination to determine whether a patient with low back pain has an underlying herniated disc.  The test is positive if the patient experiences pain down the back of the leg when the leg is raised.  *Miller v. Astrue*, 2010 WL 4942814 (E.D. Cal. November 30, 2010) (No. 1:09-cv-1257-SKO).

[16] April 29, 2008 magnetic resonance images confirmed that Plaintiff had herniated nucleus pulposa at C3-4 and C4-5 and foramen stenosis.  AR 385.  On July 24, 2008, Morris Senegor, M.D., performed a second cervical fusion of C3-4 and C4-5 at San Joaquin General Hospital.  AR 378-379.  Because Plaintiff provided these documents to the agency after the ALJ had completed his decision, they are not part of the record on which the ALJ based his decision.

**Agency Evaluation.**  Neurologist Steve McIntire, M.D., examined Plaintiff on behalf of the agency on July 23, 2006.  AR 222-225.  McIntire observed restricted cervical movements and "marked loss of range of motion of the cervical spine."  AR 224.  Plaintiff reported pain over the midline and right paraspinal region at the cervical level.  AR 222.  The third through fifth fingers on his right hand were numb.  AR 222.  McIntire provided the following functional assessment:

> Subjectively, the claimant had a recent cervical fusion.  He continues to have cervical pain and sensory symptoms in the right upper extremity.
>
> Objectively, there are significant findings on examination.  He has marked loss of range of motion of the cervical spine.  He exhibits restricted head and neck movements.  There is tenderness on palpation.  There are not motor or sensory deficits on the present examination to point to a cervical radiculopathy.
>
> Given the above findings and his recent surgery, the claimant has significant functional limitations.  He would currently be limited to one hour of walking or standing in an eight-hour day.  He would be limited to five hours of sitting in an eight-hour day.  It is anticipated that he would need to recline or lie down for two hours in an eight-hour day.  He should avoid lifting or carrying activities until he has further time to recover from his surgery.  The claimant would have difficulty with many activities due to his loss of cervical range of motion.  He would have difficulty operating machinery or vehicles or engaging in activities that require him to look over his shoulder.  He should not engage in forceful pulling or pushing activities with the upper extremities or do power gripping activities.  He would be able to utilize the hands for light gripping and grasping functions and fine manipulations.

AR 224-225.

**Magimbi's Evaluation.**  After examining Plaintiff on February 26, 2008, Magimbi prepared a "Medical Assessment of Ability to Do Work-Related Activities (Physical).  AR 326-330.  Magimbi opined that Plaintiff's ability to walk, sit and stand were impaired by his pain and limited range of neck motion.  AR 326.  He stated that, in an eight-hour workday, Plaintiff could walk less than one hour, stand one to two hours, and sit less than one hour.  AR 327.  Because of chronic pain resulting from failed surgery syndrome, Plaintiff could frequently lift only five to ten pounds.  AR 327.  Plaintiff was restricted in climbing and bending, and required rest periods during the day.  AR 328.  His neck pain prevented his working an eight-hour day, even doing sedentary work, because any activity aggravated the pain.  AR 328.  The pain was sufficient to interrupt work-related activities.  AR 329  Plaintiff's prescriptions, MS-contin and hydrocodone and acetaminophen, presented a "possibility of sedation."  AR 328.

Magimbi opined that he felt Plaintiff's pain complaints were credible, since Plaintiff had undergone surgery to get pain relief and was willing to undergo additional surgery to relieve his pain. AR 329. Magimbi reported that plans for repeat surgery were underway.[17] AR 329.

**Agency Residual Functional Capacity Assessment.** On August 25, 2006, agency reviewer D.W. Pong, M.D., determined that Plaintiff could frequently and occasionally lift and carry ten pounds; could stand or walk two hours out of an eight-hour work day; could sit for six hours in an eight-hour workday; and could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb a ladder. AR 227-228. Reaching was limited in all directions. AR 228. Pong noted that Plaintiff could stand and walk two hours but no more than one hour at a time and could perform no heavy pushing or pulling with both upper extremities. AR 227.

**Second Residual Functional Capacity Assessment.** On April 3, 2007, agency medical consultant Sadda Reddy, M.D., determined that Plaintiff could occasionally lift twenty pounds and frequently lift ten pounds; could stand or walk at least six hours in an eight-hour day; could sit for six hours in an 8-hour day; had unlimited ability to push and pull; could occasionally climb ladders; could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and had limited ability to reach but unlimited ability for handling, fingering, and feeling. AR 289-294. Reddy explained:

> [Consultive examiner's] MSO is too restrictive and not consistent with [consultive examiner's] own findings. X-rays show that the fusion is near complete. Hence no need to limit lifting to anything less than light. [Consultive examiner's] exam - motor 5/5. [Consultive examiner's] MSO is too restrictive considering [consultive examiner's] exam findings of normal strength and sensation. No objective basis to limit walking given the absence of any signs of myelopathy. There is no objective basis to limit sitting either. A light [residual functional capacity] with limited overhead reaching and no frequent neck movements is more appropriate and consistent with [consultive examiner's] exam findings and longitudinal record.

AR 294.

///

---

[17] Magimbi's reference to repeat surgery is ambiguous since it does not clearly specify whether additional spinal surgery or additional steroid injections are contemplated. Magimbi's original plan for Plaintiff contemplated repeated epidural steroid injections. AR 311.

1   **Vocational expert.**  David Dettmer testified as vocational expert.  Dettmer first testified to

2   Plaintiff's various prior positions, which ranged from medium to very heavy, and SVP 2-4.  AR

3   72.  Skills associated with those positions were "not really" transferable.  AR 72.

4   For the first hypothetical, the ALJ directed Dettmer to assume an individual 34 years old,

5   limited education, with Plaintiff's work history, and the ability to lift, push and pull twenty

6   pounds occasionally and ten pound frequently; to walk and stand frequently; to sit, stoop, or bend

7   occasionally.  AR 72-73.  Dettmer opined that such a person could not return to any of Plaintiff's

8   previous jobs.  AR 73.  Numerous light unskilled jobs would be available, however, including fast

9   food worker, mail clerk, or housekeeping worker.  AR 73.

10   For hypothetical two, the ALJ added the following non-exertional limitations to

11   hypothetical one: unlimited attention, concentration, understanding, and memory; vision

12   diminished but correctable; hearing unlimited; slightly limited in overhead reach (six hours or less

13   per eight-hour day); slightly limited in both finer and gross manipulative abilities with both

14   extremities; slightly limited to do SRT; no environmental restrictions; unlimited contact with the

15   public; occasional supervision; and slight to moderate pain.  AR 73.   Dettmer responded that

16   these limitations would not change his response to hypothetical one.  AR 73.

17   For hypothetical 2A, the ALJ directed Dettmer to assume a person moderately limited in

18   overhead reach with the right non-dominant feature; moderately limited in both fine and gross

19   manipulative abilities with the right non-dominant feature; but only slightly limited in fine and

20   gross manipulative ability with the left dominant feature.  AR 73-74.  Dettmer responded that the

21   hypothetical person could not perform any of the jobs described in hypothetical one, since all

22   required both hands.  AR 74.

23   For hypothetical 3, a sedentary residual functional capacity, the ALJ directed Dettmer to

24   assume an individual 34 years of age, limited education, work history as described, able to lift,

25   push, and pull ten pounds occasionally, five pounds frequently; to walk, stand, stoop, and bend

26   occasionally; and to sit frequently.  AR 74.  Dettmer opined that such a person could do none of

27   the jobs described in hypothetical one, but could perform such jobs as order clerk, escort vehicle

28   ///

driver, or small parts assembler, all of which had numerous positions available in the economy. AR 74.

For hypothetical four, the ALJ directed Dettmer to add the following non-exertional limitations: unlimited attention, concentration, understanding, and memory; vision diminished but correctable; hearing unlimited; slightly limited overhead reach with the right, non-dominant feature; slightly limited in both fine and gross manipulative abilities with both features; slightly limited in ability to do SRT; no environmental restrictions; unlimited contact with the public; occasional supervision; and slight to moderate pain.   AR 74-75.  Dettmer responded that those non-exertional limitations would not change his response to hypothetical three.

For hypothetical 4A, the ALJ directed the ALJ to consider that the individual was moderately limited in overhead reach with the right nondominant feature (three hours or less per shift); moderately limited in both gross and fine manipulative ability with the right non-dominant feature; only slightly limited fine and gross manipulative ability with the left dominant feature. AR 75. Dettmer opined that, as a result of these added limitations, he would eliminate the small parts assembly and escort vehicle driving positions and one-half of the order clerk positions.  AR 75.

For hypothetical 4B, the ALJ directed Dettmer to add a pain level described as moderate to severe requiring a sit/stand option, but only a slight limitation in the ability to do a simple, routine task.  AR 75.  Dettmer responded that such an individual could not perform any of the positions listed in response to hypothetical three.  AR 75.

After Plaintiff's attorney began to present a final hypothetical, the ALJ interrupted, say, "You can stop there, counsel . . . I take judicial notice of the fact that [if] he can't work an eight hour day, a 40 hour week, or would be off more than two days a month[, t]here are no jobs."  AR 75-76.

## II.    Discussion

### A.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment

which has lasted or can be expected to last for a continuous period of not less than twelve months.
42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of
such severity that he or she is not only unable to do his or her previous work, but cannot,
considering age, education, and work experience, engage in any other substantial gainful work
existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

　　　　To encourage uniformity in decision making, the Commissioner has promulgated
regulations prescribing a five-step sequential process for evaluating an alleged disability.  20
C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following
questions:

| | |
|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

　　　　The ALJ found that Plaintiff had not engaged in substantial gainful activity since May 24,
2005.  AR 26.  Plaintiff's single severe impairment was cervical and lumbar degenerative disc
disease.  AR 26.  His impairment did not meet or medically equal one of the listed impairments in
20 C.F.R. Part 404, Subpt. P. Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, and 416.926).  AR
26.  Plaintiff's past relevant work included truck driver, slaughter house worker, furniture mover,
dairy worker, and welder.  AR 29.  From May 24, 2005, through January 12, 2007, the claimant
was unable to perform work at any exertional level.  AR 26.

　　　　The ALJ determined that, as a result of medical improvement, Plaintiff's disability ended
on January 13, 2007.  AR 30.  Thereafter, Plaintiff had the residual functional capacity to perform

1  light work, subject to slightly limited overhead reaching, slight limitation if fine and gross

2  manipulation with both arms, slightly limited ability to perform simple repetitive tasks requiring

3  limited supervision, and slight to moderate pain, managed with medication.  AR 31.  Even after

4  January 13, 2007, however. Plaintiff could not return to his prior work.  AR 34.  After considering

5  Plaintiff's age, education, work experience, and residual functional capacity, the ALJ concluded

6  that unskilled jobs that Plaintiff could perform existed in the national economy in significant

7  numbers.  AR 34.

8      **B.    Plaintiff's Claims**

9      Plaintiff asks this Court to reverse the agency's denial of benefits after January 13, 2007,

10  and to remand for payment of benefits, contending that clear and convincing evidence did not

11  support the ALJ's conclusions and that the ALJ erred in omitting Plaintiff's limitation to positions

12  requiring no neck movements.  The agency responds that the ALJ gave clear and convincing

13  reasons for his credibility findings and properly determined Plaintiff's residual functional

14  capacity.

15      **C.    Scope of Review**

16      Congress has provided a limited scope of judicial review of the Commissioner's decision

17  to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

18  a court must determine whether substantial evidence supports the Commissioner's decision.  42

19  U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

20  402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

21  1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

22  as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

23  be considered, weighing both the evidence that supports and the evidence that detracts from the

24  Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

25  evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

26  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

27  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

28  the ALJ's findings are supported by substantial evidence.  *See Lewis v. Astrue*, 498 F.3d 909, 911

1    (9th Cir. 2007);  *Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir.

2    1987).

3           In reviewing the Commissioner's decision, the Court may not substitute its judgment for

4    that of the Commissioner.  *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996).  The Court "must

5    consider the entire record as a whole, weighing both the evidence that supports and the evidence

6    that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a

7    specific quantum of supporting evidence."  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir.

8    2007) (*internal citation and quotation marks omitted*).

9           **D.      Credibility of Plaintiff's Testimony**

10          In his opening brief, Plaintiff accuses the ALJ of ignoring the medical evidence that

11   supported his testimony. The agency responds that "clear and convincing evidence" supported the

12   ALJ's determination that Plaintiff's testimony was not credible.  Affirming the ALJ's decision

13   would require this court to isolate the limited portion of the record on which the ALJ chose to

14   rely.  As discussed above, the Court may not do so.  *See Lingenfelter*, 504 F.3d at 1035.  Review

15   of the record as a whole supports a single conclusion: the ALJ erred in concluding that Plaintiff's

16   testimony supporting his claim for the period after January 12, 2007, was not credible.

17          An ALJ is not "required to believe every allegation of disabling pain" or other non-

18   exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

19   885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony

20   after a medical impairment has been established, the ALJ must make specific findings assessing

21   the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and*

22   *Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is

23   not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834,

24   *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He

25   or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

26   unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466

27   F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the

28   ///

court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *citing Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9[th] Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

> *Orn*, 495 F.3d at 635.

///

19

1    An ALJ may not disregard a claimant's testimony solely because objective medical

2  evidence does not fully substantiate it, as the ALJ did here. *Robbins*, 466 F.3d at 883.  Unless the

3  ALJ finds that affirmative evidence demonstrates that the claimant is a malingerer, he or she can

4  only find the claimant's testimony not credible by making specific findings of credibility and

5  supporting each such finding with clear and convincing evidence. *Id.*  Here, the ALJ found

6  Plaintiff to be malingering stating:

7           After complete review of all medical records and the testimony, it appears that the
           claimant simply decided to stop working and has not considered returning to any
8           work, any time after being laid off in November 2004.  During the interim, he did
           have significant impairments that prevented him from working for a period of time,
9           but those impairments were resolved by surgery and complete fusion.  There is no
           medical evidence of impairments that prevent him from performing any work or
10          explain his extremely limited activities of daily living.

11    AR 33.

12    In a perfect display of circular reasoning, the ALJ concluded that Plaintiff was a malinger

13  because the medical evidence did not support Plaintiff's allegations after January 12, 2007, stating

14  "[h]e has not followed Dr. Pitt's advice from May 2006, that he actively work to increase cervical

15  range of motion and improve his posture."  AR 32-33.  The record reveals that, on May 26, 2006,

16  following Pitts' post-surgical evaluation, Plaintiff began physical therapy intended to increase

17  strength and mobility and minimize pain, but Plaintiff saw the therapist only three times.  AR 287-

18  288.  Since the record does not explicitly set forth why Plaintiff discontinued therapy, and no one

19  asked about it at the hearing, this Court will not simply condemn Plaintiff for discontinuing

20  physical therapy, particularly since at Plaintiff's last therapy session on June 2, 2006, he

21  complained of soreness.  AR 288.  Plaintiff's continued pain is consistent with Dr. Bairamian's

22  warnings that surgery could relieve the tingling and numbness but would not alleviate the pain

23  that was Plaintiff's greatest complaint.

24    The ALJ chose not to address Plaintiff's chronic pain nor to acknowledge evidence in the

25  record indicating that surgery could alleviate Plaintiff's paresthesia but could not address the

26  underlying spondylosis that created the pain.  In fact, the ALJ erroneously claimed that Plaintiff

27  had not complained to his physicians about pain, only about the tingling and numbness in his arms

28  and hands:

1   Although the claimant continued to report back, neck, and right arm pain, the
    medical record does not contain findings or opinions that support ongoing
2   disability.  His symptoms as reported are, at time[s], inconsistent.  As discussed
    above, as of June 2006, the claimant's primary complaint was numbness in three
3   digits of his right non-dominant hand.  There is little evidence of him complaining
    the examining or treating doctors [of] chronic severe pain as he testified to [sic] at
4   the hearing.

5   AR 30.

6   The record contradicts the ALJ's findings.  The ALJ stated that Plaintiff's main complaint

7   was numbness in three fingers, but Dr. Bairamian's treatment notes indicate that Plaintiff's main

8   complaint was neck pain.  AR 30, 198.  Bairamian considered referring Plaintiff to a pain expert

9   and by-passing the surgery that was expected only to relieve Plaintiff's paresthesia. AR 198-199.

10  Prior to Plaintiff's first surgery, Dr. Bairamian repeatedly advised Plaintiff that surgery to release

11  his nerve root compression could alleviate the numbness in his upper extremities but not his pain.

12  AR 198-199, 200-201, 202, 204.

13  According to the record, Plaintiff consistently complained of severe pain (AR 116, 127,

14  132, 164, 174 ), numbness in his arms, hands, and fingers that interfered with grasping and

15  manipulating objects (AR 116, 127, 132, 137, 161, 174); and limited head, neck, and body motion

16  (AR 164).  Medical records before the first surgery documented physical effects and

17  measurements of pain (AR 188, 202, 204, 205), numbness (AR 188, 200, 202, 204, 206, 215-

18  216), and loss of motion (AR 205).   Immediately following Plaintiff's cervical fusion procedure,

19  medical professionals at the Doctors Medical Center emergency room acknowledged that

20  Plaintiff's need for stronger pain relief following the first surgery resulted from Plaintiff's long

21  history of chronic pain, which had habituated him to milder pain relievers.  AR 272-278.

22  In addition, after Plaintiff underwent a C5-6 anterior cervical discectomy and fusion on

23  March 24, 2006 (AR 213-214), although the graft itself was "well positioned," (AR 211),  x-rays

24  revealed remaining problems, including an apparent bone fragment at C4-5, and degenerative

25  changes throughout his spine, including disc space narrowing and moderate osteophyte formation.

26  AR 212.  The numbness and pain in the arm and hand was improved but not entirely gone, and the

27  neck pain remained.  AR 211, 221.

28  ///

21

The evaluation of x-rays taken January 2007 reported a stable C5-6 fusion but also noted mild encroachment of the intervertebral foramina at C3-4. AR 267. But, based solely on the radiologist's report of a successful fusion, the ALJ determined that Plaintiff's disability ended January 12, 2007:

> [R]adiographic studies obtained January 12, 2007 show complete cervical fusion. A cervical MRI from July 16, 2007 showed some osteophytic changes around the fusion site, but no evidence of disc herniation or cord compression [Exhibit 15F, 18F9]. Although the claimant testified that he has failed cervical surgery, there is no medical evidence supporting his testimony . . . . . There is no medical evidence of a lower back injury that supports the intensity, frequency, or severity of lower back pain and leg pain as reported by the claimant. On June 5, 2007 he reported that his lower back "went out" the prior week, and had been hurting ever since, and his neck still bothered him [Exhibit 19F2]. This suggests that any back pain was temporary, as he evidently did not have back pain symptoms prior to the reported event. A lumbar MRI showed moderate degenerative disc disease at L3-4 and mild degenerative disc disease at L5-S1 with a small midline disc protrusion, but not causing compression of the thecal sac or displacement of nerve roots. There was no evidence of disc herniation or spinal canal stenosis [Exhibit 18F10].

AR 30.

At the hearing, the ALJ confirmed that he was in possession of Exhibits 1-18 (which included medical records through AR 344). AR 42. Although the ALJ correctly notes that the January 2007 radiographic studies showed no disc herniation or cord compression at C5-6, the record reveals continued medical treatment throughout 2007 as Plaintiff continued to experience neck pain and upper extremity numbness, and developed lumbar (lower back) pain.

On February 7, 2007, Kerwin noted that, despite a "good fusion," Plaintiff still experienced numbness and tingling in his hands. AR 349. A lumbar MRI, administered on February 16, 2007, revealed moderate degenerative disc disease at L3-4 and mild degenerative disc disease at L5-S1. AR 340. A cervical MRI on the same day noted that a prominent right uncovertebral joint osteophyte caused a moderately severe compromise of the right C3-4 neural foramen. AR 338. There was also a mild compromise of the right neural foramen at C4-5. AR 338.

On March 4, 2007, Ramos examined Plaintiff, noting tenderness in the area of the third, fourth and fifth lumbar vertebra and limited range of movement both side-to-side and front-to-back. AR 343. On March 6, 2007, Kerwin noted the consultation on Plaintiff's cervical pain and

that Plaintiff was experiencing "bad" pain and numb arms.  AR 348.  Kerwin questioned whether Plaintiff had developed left radiculopathy.  AR 348.  On April 5, 2007, Kerwin noted that Plaintiff's neck was stiff and painful, and that his left arm was both painful and numb.  AR 347.  However, following the pain consultation, medication had made some of the pain "bearable."  AR 347.  On at his June 5, 2007 appointment with Kerwin, Plaintiff continued to report sharp neck pain and tingling arms.  AR 346.  Kerwin considered a referral to a surgeon and neurologist.  AR 346.

On June 26, 2007, Dr. Magimbi, the pain specialist, evaluated Plaintiff's chronic pain, dating to his spinal fusion, and considered Plaintiff to have degenerative spondylosis in both the cervical and lumbar regions.  AR 310-311.  His plan was to prescribe MS-contin and schedule Plaintiff for cervical steroid injections.  AR 311.  On July 26, 2007, Plaintiff was admitted to Sutter Tracy Community Hospital for a cervical epidural steroid injection.  AR 308-309.  Magimbi's diagnosis was cervicalgia, degenerative disk disease of the cervical spine, cervical radiculopathy, and ***failed cervical surgery syndrome***.  AR 309 (*emphasis added).*

In notes of Plaintiff's October 4, 2007 appointment, Ramos noted that Plaintiff's chief complaints were severe chronic neck and back pain.  AR 342-343.  Straight leg tests caused pain.  AR 343.  Ramos opined that Plaintiff's condition was worsening.  AR 343.  When Plaintiff returned to see Dr. Ramos on October 24, 2007, although Ramos described Plaintiff's cervical pain as "mild to moderate discomfort," Ramos also noted Plaintiff's obvious lower back pain, as evidenced by a slow, cautious gait.  AR 333.  After diagnosing Plaintiff as suffering from intervertebral disc disorder with myelopathy in both his cervical and lumbar spine, Ramos requested a referral to an orthopedic surgeon.  AR 333.

Finally, the ALJ found that:

> The claimant and his representative were given time after the hearing to submit additional medical evidence, but none has been received showing any new or aggravated cervical impairment.

AR 30.

The record does not support this finding.  After the hearing and before completion of the ALJ's opinion, Plaintiff submitted Dr. Kerwin's clinical notes from December 13, 2005 through

June 5, 2007 (AR 345-360) and Dr. Magimbi's clinical notes from June 26, 2007 through February 19, 2008 (AR 362-368).  Although the spinal fusion was expected to relieve the tingling in Plaintiff's hands and arms, Kerwin's notes for January 9, 2007; February 7, 2007; March 6, 2007; April 5, 2007; and June 5, 2007, reported continued tingling and numbness in the arms and hands.  AR 346-350.  Kerwin noted continued cervical (neck) pain and stiffness at appointments on January 9, 2007; February 7, 2007; March 6, 2007; April 5, 2007; and June 5, 2007 ("sharp pain neck").  AR 346-350.  Kerwin only noted lumbar (lower back) pain on June 5, 2007.  AR 346.

On August 21, 2007, Magimbi noted that Plaintiff was experiencing significant break-through pain that interfered with his daily activities.  AR 365.  On September 18, 2007, Magimbi noted that Plaintiff was experiencing his worst pain in the morning but that activity also aggravated Plaintiff's pain toward the day's end.  AR 364.  Even without naps, Plaintiff could sleep only about four hours a night because he repeatedly awoke in pain.  AR 364.  On March 26, 2008, Magimbi noted that the then-current doses of MS-contin and Hydrocodone/APAP were not providing optimal pain relief and that repeat surgery was being scheduled.  AR 363.  Plaintiff's pain had become worse by February 19, 2008, preventing his sleep, limiting his range of motion, and making it difficult to walk.  AR 362.

The ALJ's error is based, at least in part, on his decision to favor the determination of agency reviewers, Dr. Pong and Dr. Redda, neither of whom had ever examined Plaintiff.  These nontreating, nonexamining physicians rejected the findings of both Plaintiff's treating physicians and the agency's consulting physician, Dr. McIntire, and concluded that the medical record did not support Plaintiff's claims of chronic pain.

In resolving this issue, it is important to keep in mind that whether Plaintiff had a serious physical disability is not at issue.  Plaintiff's treating physicians, the agency physicians, and the ALJ all agreed that Plaintiff's cervical and lumbar disc disease is a severe impairment.  The only question before this Court is the degree to which the pain of these impairments disable Plaintiff, an inherently subjective determination.  To the extent to which no one can accurately know, simply by perusing Plaintiff's medical records, how bad his pain is or how much activity or static

1  positioning aggravated his pain, Plaintiff's residual functional capacity must be established by
2  knowledgeable medical opinion.

3  The regulations provide that medical opinions be evaluated by considering (1) the
4  examining relationship; (2) the treatment relationship, including (a) the length of the treatment
5  relationship or frequency of examination, and the (b) nature and extent of the treatment
6  relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that
7  support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).  Three types of physicians may
8  offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians);
9  (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those
10 who neither examine[d] nor treat[ed] the claimant (nonexamining physicians)."  *Lester*, 81 F.3d at
11 830.

12 A treating physician's opinion is generally entitled to more weight that the opinion of a
13 doctor who examined but did not treat the claimant, and an examining physician's opinion is
14 generally entitled to more weight than that of a non-examining physician.  *Id.*  The Social Security
15 Administration favors the opinion of a treating physician over that of nontreating physicians.  20
16 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A treating physician is employed to cure and has a
17 greater opportunity to know and observe the patient.  *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th
18 Cir. 1987).   Particularly in a case such as this one, objective medical measures such as x-rays,
19 MRIs, and blood analysis are of limited assistance.  Because a claimant's perception of pain and
20 his or her ability to persist in the face of pain are highly individualized, a treating physician,
21 especially one with a long-term relationship with the claimant, is more likely to be able to
22 evaluate the claimant's residual functional capacity.  Dr. McIntyre's opinion is highly probative,
23 in that it acknowledged that, on examination, a nontreating physician could observe Plaintiff's
24 obvious pain and restricted movement, even following the 2006 a cervical spinal fusion.  The ALJ
25 erred in disregarding the opinions of treating and examining physicians for the opinions of agency
26 reviewers who had neither treated nor examined Plaintiff.
27 ///
28 ///

### E.   Omission of Plaintiff's Inability to Move His Neck in RFC Hypotheticals

In his second claim, Plaintiff correctly contends that the ALJ erred in omitting Plaintiff's inability to move his neck from the hypothetical questions presented to vocational expert Dettmer. This error was harmless since the ALJ conceded that, if Plaintiff could not work an eight-hour day, no jobs would be available to him. Both Magimbi and McIntyre agreed that Plaintiff's chronic severe pain and limited motion prevented him from working an eight-hour day.

## III.   Conclusion and Order

"The court shall have the power to enter, upon pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  In social security cases, the decision to remand to the Commissioner to award benefits is within the court's discretion. *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989).  "If additional proceedings can remedy defects in the original administrative proceedings, a social security case should be remanded.  Where, however, a rehearing would simply delay receipt of benefits, reversal and an award of benefits is appropriate." *Id.* (citation omitted).  If the record is fully developed and further administrative proceedings will serve no useful purpose, a reviewing court should simply reverse and award benefits. *Varney*, 859 F.2d at 1399.

Accordingly, this Court orders that the administrative determination be REVERSED and the case REMANDED for payment of benefits.  The Clerk of Court is hereby directed to ENTER JUDGMENT in favor of Plaintiff Martin Campbell and against Defendant Michael J. Astrue, Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   __January 6, 2011__          _____/s/ Sandra M. Snyder_____
                                                        UNITED STATES MAGISTRATE JUDGE